**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **FOSTER POULTRY FARMS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 17-0483-WS-M** |
| ) | |
| **THE WATER WORKS & SEWER BOARD** ) | |
| **OF THE CITY OF DEMOPOLIS,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 45) and plaintiff's Motion for Partial Summary Judgment (doc. 47). Both Motions have been briefed and are now ripe.

**I.      Nature of the Case.**

This dispute arises from a food processing facility's contentions that a municipal water board's inadequate and unreliable water service caused it to suffer lost production, business interruption, and ensuing damages. More specifically, plaintiff, Foster Poultry Farms, Inc., alleges that defendant, The Water Works and Sewer Board of the City of Demopolis, has provided inadequate water service to Foster Farms' plant in Demopolis, Alabama, and has retaliated against Foster Farms for complaining by imposing an arbitrary wastewater discharge restriction. On the strength of these allegations, Foster Farms asserts state-law causes of action against the Water Board sounding in negligence (Count One), wantonness (Count Two), breach of contract (Count Three), breach of contract third-party beneficiary (Count Four), injunctive relief (Count Five) and declaratory relief (Count Six).[1]

---

[1]      Federal subject matter jurisdiction is properly predicated on the diversity provisions of 28 U.S.C. § 1332. The First Amended Complaint reflects that Foster Farms is a citizen of California for diversity purposes, while the Water Board is an Alabama citizen. Plaintiff expressly demands monetary damages of $495,577, exclusive of interest and costs; therefore, the $75,000 jurisdictional threshold is plainly satisfied.

Now the parties have filed cross-motions for summary judgment. The Water Board seeks dismissal of all claims and causes of action on a variety of grounds, while Foster Farms moves for summary judgment on the limited issue of whether an express and/or implied contract existed between the parties at all material times.

## II. Factual Background.[2]

For more than two decades, Foster Farms has operated a food processing facility in Demopolis, Alabama. The plant employs roughly 450 people, and is the largest corn dog producer by product count in the United States. (Miller Dep. (doc. 54, Exh. 1), at 9.) The facility requires adequate flow and pressure of water for numerous aspects of the production and cleanup processes, as well as for safety (fire suppression). (*Id.* at 20-21, 24-27.) For example, the facility's fire suppression system requires water volume of approximately 1,000 gallons/minute and pressure of approximately 40 psi to function properly. (*Id.* at 24.) Foster Farms' day-to-day operations depend on it receiving reliable volumes and pressures of water. (Miller Aff. (doc. 54, Exh. 3), ¶ 10.)

### A. Water Service Disruptions Beginning in March 2014.

Both sides agree that the Water Board provided consistent, adequate, reliable water service to the Foster Farms plant until March 2014. (Miller Aff., ¶ 2; Miller Dep., at 77.) Indeed, Foster Farms' evidence confirms that water flow and pressure readings at the facility were consistently adequate during that time frame. (Smith Dep. (doc. 54, Exh. 7), at 77-80.)

---

[2] The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment. … Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted). As to each cross-motion for summary judgment, then, the record will be viewed in the light most favorable to the non-movant, with all justifiable inferences drawn in the non-movant's favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [each non-movant]'s version of the facts drawing all justifiable inferences in [each non-movant]'s favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

Prior to March 2014, the Water Board supplied water to the facility via a line north of the plant on Highway 80, tied in to the Industrial Park Water Tower ("IP Tower"). (Miller Aff., ¶ 2; McCants Aff. (doc. 46, Exh. 1), at 1.) A two-mile line ran from Highway 80 to Foster Farms' plant. (*Id.*) In 2014, however, the 12-inch cast iron pipe comprising that water line (which had been installed in the 1970s) experienced repeated breaks, holes and cracks caused by corrosion of the metal surfaces. (McCants Aff., at 1.) At the same time, the Water Board adopted a separate plan to refurbish the IP Tower by painting it inside and out, which would require taking that tower out of service for some time. (McCants Dep. (doc. 46, Exh. 9), at 121-22; McCants Aff., at 2.)

As a direct consequence, Foster Farms' Demopolis plant began experiencing periodic, chronic interruptions in water service (as to both flow and pressure). (Miller Aff., ¶ 3.) Foster Farms characterizes these interruptions as becoming "systemic" starting in March 2014. (Miller Dep., at 64.)[3] The Water Board acknowledges that the numerous breaks in the water main caused interruptions in service, which in turn caused production shutdowns at the Foster Farms plant, all resulting from what was quintessentially "a water board problem to fix." (McCants Dep., at 110; Miller Aff., ¶ 3.) All told, Foster Farms documented approximately three dozen interruptions in water service (leading to production shutdowns ranging in duration from 7 minutes to 7+ hours) between 2014 and 2017. (Doc. 46, Exh. 4.)[4] In repairing breaks and leaks

---

[3]     The Water Board sent a series of letters to Foster Farms documenting and explaining its operational disruptions. That correspondence identified water issues on March 31, 2014 (crack in 16-inch water main reduced pressure below minimum required to operate plant equipment); April 17, 2014 (crack in 12-inch water main reduced pressure below minimum required to operate plant equipment); June 16, 2014 (two holes formed in 12-inch water main, with fire hydrants opened to relieve pressure during repair process, thereby reducing pressure below minimum required to operate plant equipment); July 28, 2014 (two holes formed in 12-inch water main, with pressure falling below minimum required to operate plant equipment when fire hydrants were opened during repair process); October 27, 2014 (two holes formed in 12-inch water main, with pressure falling below minimum requirements during repair process); February 5, 2016 (failure of 6-inch water main on Myrtlewood line, causing pressure to fall below minimum required to operate plant equipment); and February 17, 2016 (break in 6-inch water main caused by contractor installing drainage culverts, with pressure falling below minimum required to operate plant equipment). (Doc. 54, Exh. 8.)

[4]     According to Foster Farms, the total amount of lost production time as a result of water-service interruptions and disruptions to plant activities from March 2014 to the present is 67.78 hours. (Miller Dep., at 79-80.)

to that water line, the Water Board "had to dig out large portions of Foster Farm's concrete lot," which it never subsequently repaired. (Miller Aff., ¶ 3.)

Foster Farms repeatedly expressed concerns to the Water Board about these interruptions in service. (Miller Aff., ¶ 3.) In July 2014, Foster Farms representatives visited the Water Board to complain about the disruption to their business caused by these ongoing unplanned water outages. (Miller Dep., at 65.) On November 17, 2014, Paul Miller, the General Plant Manager, followed up with a letter to the Water Board in which he stated that "Foster Farms has recorded no less than 8 disruptions to service since the water tower was taken offline in March of 2014." (Doc. 46, Exh. 3.) In that correspondence, Miller expressed concern about "the potential for a public food safety health hazard" resulting from these service interruptions, as well as "significant financial losses to both the company and its employees," estimated at $195,000 in additional costs and lost wages to date. (*Id.*) The November 2014 letter concluded with a veiled threat of litigation, as Foster Farms wrote, "It is our hope that by working together … this issue will be resolved amicably ***and without the need for further action.***" (*Id.* (emphasis added).)

Given the deterioration of the 12-inch cast iron pipe, the Water Board determined that the entire two-mile water line from Highway 80 to the Foster Farms plant must be replaced. (McCants Dep., at 110.) On November 17, 2014, based on Foster Farms' concerns, the Water Board declared an emergency to expedite that project, which is sometimes referred to in the record as "the Rangeline Road water line project." (Doc. 46, Exh. 11.) The Water Board began constructing the new two-mile water line from Highway 80 to the Foster Farms plant in early 2015, utilizing an average of four to five employees on the project. (McCants Aff., at 3.) The project consisted of replacing the old, corroded 12-inch pipe with new 12-inch pipe. (*Id.*)

###### B. The Tosco Road Temporary Solution.

As the Water Board's crews worked on the Rangeline Road water line project (again, replacing the 12-inch pipe connecting the facility with the IP Tower to the north), the Foster Farms plant required an emergency supply of water to enable it to carry on with plant operations in the interim. (McCants Aff., at 3.) The solution devised by the Water Board was to connect the Foster Farms plant temporarily to the Tosco Road Water Tower (the "Tosco Tower"), located six miles to the south. (*Id.*) To do so, the Water Board utilized a preexisting water line owned by non-party Myrtlewood Water System. That line consisted of a 6-inch pipe running for 4.9 miles from the Tosco Tower to the "Y" intersection of Highway 21 and Highway 19, with an 8-

inch pipe running from that intersection for an additional 0.9 miles in the direction of Foster Farms, stopping at railroad tracks 0.7 miles from the plant. (*Id.*) Thus, the Water Board's short-term, emergency solution was to connect the Foster Farms plant to the Myrtlewood line at the railroad tracks. (*Id.*) The Water Board understood that Foster Farms' water service from Tosco Tower to the south would not be as good as its regular IP Tower water service from the north, and always contemplated this to be a temporary, emergency solution to supply water to the Foster Farms plant until work was completed to replace the line to the north. (*Id.* at 3-4.)

The Tosco Tower tie-in did not occur until approximately May 2015. (Miller Aff., ¶ 4.) Thus, there was a roughly six-month period between November 2014 and May 2015 when the Foster Farms plant continued to experience unplanned, disruptive water service interruptions. (*Id.*) Even after the Tosco Tower connection was completed, Foster Farms encountered ongoing water problems. Water service to the Foster Farms plant pursuant to this temporary fix was "high pressure / low flow," with high water pressure causing plaintiff's internal plumbing fixtures to "blow off the walls" until such time as Foster Farms installed pressure-reducing valves at substantial expense. (*Id.*, ¶ 5.) And the low flow of water from the Tosco Tower had negative impacts on plant operations, especially as to the refrigeration evaporative cooling towers and sanitation processes. (*Id.*)

### C. Delays, Negotiations and the Statement of Intent.

The Rangeline Road water line project proceeded slowly. It was hampered by various circumstances, including weather-related delays and the separation of a Water Board employee due to disability. (McCants Aff., at 3.) By spring 2016, Foster Farms, having grown weary of ongoing problems and delays, retained counsel to engage in dialogue with the Water Board. (Miller Aff., ¶ 6.) Pursuant to those discussions, Foster Farms requested that the Water Board make a firm written commitment to complete the project by a date certain. (*Id.*) Foster Farms communicated to the Water Board that failure to do so would result in litigation. (*Id.*)[5] On or about June 15, 2016, the Water Board signed a Statement of Intent, through which it committed to completing the project by September 15, 2016, barring an Act of God. (*Id.*, ¶ 7.) In reliance

---

[5]    Specifically, Foster Farms' counsel sent a letter to the Water Board's attorney on May 16, 2016, indicating that they represent Foster Farms "in connection with the issue of water outages that they continue to experience," and cautioning that "[o]ur client is ready to proceed with litigation if necessary." (Doc. 54, Exh. 16.)

on that Statement of Intent, Foster Farms refrained from initiating litigation at that time. (*Id.*) More generally, during the approximately 2.5-year period in which the IP Tower was offline and unavailable to the Foster Farms plant, the Water Board repeatedly assured Foster Farms that this issue was a top priority. (*Id.*, ¶ 13.) Foster Farms relied on those assurances in refraining from taking legal action, even as it signaled to the Water Board that litigation was on the table. (*Id.*)

Unfortunately, the Rangeline Road project was not completed by the September 15, 2016 deadline specified in the Statement of Intent. (McCants Aff., at 3.) The Water Board attributed this failure to "personnel issues and weather." (*Id.*) The project was finished two months later, with the IP Tower coming back online in mid-November 2016. (Miller Aff., ¶ 8.) Although Foster Farms was restored to the IP Tower at that time, it was dissatisfied with the resulting service because the pressure was too low; indeed, Foster Farms was receiving inadequate flow of water to its boilers and refrigeration evaporative cooling towers. (*Id.*) As a result, Foster Farms requested that the Water Board place the plant back on the Tosco Tower because the IP Tower water service was causing even greater disruption than the Tosco Tower water service had. (*Id.*) The Water Board granted this request. (McCants Aff., at 3.) After returning to the Tosco Tower line, however, Foster Farms continued to experience water-related issues, including outages to the evaporative cooling towers and inadequate flow for the fire suppression system. (Miller Aff., ¶¶ 8-9.)[6]

### D. *Foster Farms Goes Back on the IP Tower.*

In June 2018, Foster Farms requested that the Water Board switch its water service back to the IP Tower line. (Miller Aff., ¶ 9.)[7] The Water Board accommodated this request. (McCants Aff., at 3-4.) For a period of several months thereafter, Foster Farms neither voiced complaints nor identified problems with its water service. (*Id.*; Ferrell Dep. (doc. 46, Exh. 6), at

---

[6] On the latter point, plaintiff's expert engineer, David Upton, P.E., opined that the Tosco Tower line reduced flow and pressure to the fire hydrant on Foster Farms property to unacceptably low levels. (Upton Aff. (doc. 54, Exh. 14), at 3 ("This flow is not considered to be adequate for a fire flow at an industrial plant and the pressure is low enough that the system integrity is considered to be compromised ….").)

[7] According to engineer Upton, Foster Farms made this request "[i]n order to try and mitigate the lack of proper flow and pressure from the Tosco Road Tank and to prevent/minimize plant operations issues." (Upton Aff., at 5-6.)

8 (stating that since June 7, 2018, flow and pressure seemed better, and "I've not had any complaints").)[8]

Although plaintiff documents ongoing water issues at the plant today, its own evidence dispels any inference that the Water Board is to blame. In particular, plaintiff's expert engineer, David Upton, P.E., states in his report that even after returning to the IP Tower line, Foster Farms has "still experienced some pressure issues when cleaning and disinfecting the plant (the highest flow times)," during which internal pressures have dropped "to the middle 20 psi range which is insufficient for that required hygienic activity." (Upton Aff. (doc. 54, Exh. 14), at 6.) Moreover, plaintiff's risk assessment vendor concluded that after Foster Farms' water service was restored to the IP Tower line in June 2018, the facility's water service lacks sufficient flow or pressure to satisfy the demands of its internal fire suppression systems. (Smith Dep. (doc. 54, Exh. 7), at 98-100.)[9] Significantly, though, that vendor testified that flow and pressure readings were sufficient at the Water Board hydrant, but not at the Foster Farms private hydrant just 75 feet away. (*Id.* at 32-40, 100-02.) As the vendor acknowledged, Foster Farms is losing pressure and flow somewhere after the water passes the City hydrant, but he does not know where or why. (*Id.* at 40.) This testimony by plaintiff's own witness reflects that whatever problems Foster Farms may presently be experiencing with water flow and pressure are on its side of the meter, not the Water Board's. Foster Farms submits no evidence to link those current supply issues to any acts, omissions or shortcomings by the Water Board.

---

[8]    To be sure, Foster Farms has submitted the Affidavit of Paul Miller, who avers that "after switching the water outages continued" and the Foster Farms plant "continue[s] to face issues with inadequate flows and pressures" even after being back on the IP Tower, including concerns with the adequacy of volumes and pressures for its fire suppression system in the event of a fire. (Miller Aff., ¶¶ 9-10.) However, plaintiff's other evidence undermines Miller's averments on this point. Plaintiff cannot pick and choose which of its witnesses are credited on summary judgment and which are not.

[9]    That vendor's Loss Prevention Report for Foster Farms based on a September 2018 inspection included a specific recommendation that "[w]ater supply for the facility should be improved providing a minimum flow of 1,000 gpm at a residual flowing pressure of 35 psi at the base of the Compressor Room Riser" for fire protection purposes. (Doc. 54, Exh. 19, at 3.)

### E.     The Oil and Grease Surcharge.

During the spring/summer 2016 negotiations concerning pressure and flow issues at the Foster Farms plant, the Chair of the Water Board notified Foster Farms that the Water Board had discretion to lower the oil and grease discharge limits.  (Miller Aff., ¶ 6.)  Foster Farms construed these comments as suggesting that the Water Board might impose more restrictive limits in retaliation for Foster Farms' continued complaints and demands concerning inadequate water service.  (*Id.*)  Foster Farms believes the proposal was retaliatory because whenever it complained of service issues, Water Board officials "always steered [the conversation] back to wastewater."  (Miller Dep. (doc. 54, Exh. 1), at 88-89.)  For its part, however, the Water Board maintains that the proposal to lower oil and grease discharge limits originated from discovery of "a big layer of oil and grease" at the wastewater treatment plant, which was remediated by bringing in an industrial vacuum truck on several occasions.  (McCants Dep. (doc. 46, Exh. 9), at 239-40.)  Testing revealed "a large quantity of oil and grease" at the Industrial Park South lift station, where Foster Farms was one of only two SID permit holders discharging oil and grease.  (*Id.* at 241.)  Excessive buildup of oil and grease at that lift station caused an overflow event that had to be reported to the Alabama Department of Environmental Management ("ADEM"), which inquired as to how the Water Board would prevent a recurrence.  (*Id.* at 246-47.)

The Water Board ultimately enacted its proposal to reduce the limits for oil and grease discharge.  On June 19, 2017, the Water Board passed Resolution 2017-004, which amended its ordinance to provide for a surcharge of $0.60 per pound of oil and grease in excess of 5 mg/l.  (Doc. 45, Exh. 2.)  The effect of this resolution was to reduce drastically the discharge limit for oil and grease (from 50 mg/l to 5 mg/l), while simultaneously doubling the surcharge rate (from $0.30 to $0.60 per pound of excess).  (Miller Aff., ¶ 11.)  According to the Water Board, the only customer other than Foster Farms affected by Resolution 2017-004 was a trucking company called Dana Suttles, but the record is devoid of evidence as to the extent or severity of those effects on the trucking company.  (McCants Dep., at 263 ("It would impact Dana Suttles also, but I don't know how.  If you ask me how it has impacted them, I can't tell you.").)  The Water Board did not perceive the 5 mg/l limit as posing a major obstacle to Foster Farms, because "we

went back … and looked back at Foster Farms' records, and it looked like they were complying with it anyway, so it didn't look like it was a big deal." (*Id.* at 276.)[10]

Plaintiff's expert engineer, Upton, opines that typically wastewater plants are designed to handle oil and grease discharges of up to 100 mg/l, which is the typical value imposed by wastewater treatment systems for surcharges. (Upton Aff., at 6.) Upton further states that "the mandating of 5 mg/l is extremely and unreasonably low," and that the Water Board "had no reasonable, rational or scientific basis to lower the oils and grease waste-water surcharge rate to 5 mg/l." (*Id.* at 6-7.) A representative of ADEM testified that no one at that agency made a recommendation to the Water Board to set the oil and grease limit at 5 mg/l. (Ramsey Dep. (doc. 54, Exh. 21), at 21.) According to ADEM, 100 mg/l would be a typical level for oil and grease discharges for pretreatment facilities in Alabama. (*Id.* at 26-27.) Even the Water Board's consultant acknowledged in an email prior to passage of the Resolution that "I would like to include a direct reference to a lower limit but most of the single digit limits that I located were not for pretreatment facilities [like Foster Farms]. I will keep looking." (Doc. 54, Exh. 23.) Thus, the Water Board itself did not locate any precedent for setting such a restrictive discharge limit. However, the Water Board relied on its engineering consultant, Scott Trott, in fixing the new discharge limit at 5 mg/l. (McCants Dep., at 252, 257-60.) Trott informed the Water Board that the 5 mg/l level was recommended by ADEM. (*Id.* at 252, 257-58.)

The Foster Farms plant exceeded the 5 mg/l discharge limit for oil and grease in October 2018,[11] and expects to receive an invoice for payment of the surcharge. (Miller Aff., ¶ 11.) At no time has the Water Board ever communicated that no surcharge will be invoiced to Foster Farms for the October 2018 overage. (*Id.*)

### F. Duties and Relationships between the Parties.

A significant issue in this case concerns the existence and nature of any contractual or common-law duties running from the Water Board to its customer, Foster Farms. The summary

---

[10]    This testimony flies in the face of the Water Board's suggestion in its summary judgment briefs that Foster Farms' oil and grease discharges were somehow excessive, causing operational difficulties, and attracting ADEM scrutiny that warranted or necessitated passage of Resolution 2017-004 to rein in such excess discharges.

[11]    Indeed, ADEM records confirm that Foster Farms experienced oil and grease discharge levels as high as 23.7 mg/l during that month. (Doc. 54, Exh. 24.)

judgment record includes evidence purportedly bearing on this question. Former Water Board president Chuck Smith testified that the Water Board entered into a contract with the City of Demopolis in the 1940s to supply water to the City's citizens. (C. Smith Dep. (doc. 54, Exh. 25), at 27.) Smith further testified that the Board is "responsible for supplying reliable water service to any customer." (*Id.* at 34.)[12] Plaintiff also cites a book called *The Water Board Bible*, which describes the Water Board's mission as "providing high-quality, dependable-quantity water and other services at reasonable prices." (Doc. 54, Exh. 26.) And Water Board official Jay Reynolds testified that the Water Board provides a product (*i.e.*, water) to its customers, in exchange for which it receives money from its customers. (Reynolds Dep. (doc. 54, Exh. 28), at 25-26.) Reynolds, who is a layperson, offered his opinion that no contract exists between the Water Board and its customers for the provision of and payment for water. (*Id.* at 26, 32.)

## III.  Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual

---

[12]     According to Smith, the Water Board satisfied this obligation as to Foster Farms because "we spent thousands and thousands of dollars to help Foster Farms, get them a redundant system. They're the only ones in this town that have that type redundance of a system, water coming from two different locations into one." (*Id.* at 35.)

determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

Here, both sides have moved for summary judgment on the claims asserted in this action. It is well-settled that "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same). The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits"). Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Page*, 702 F. Supp.2d at 1345 (citations omitted); *see also Murray*, 620 F. Supp.2d at 1307. Such is the case here.

## IV. Analysis.

As noted, there are pending cross-motions for summary judgment. In its Rule 56 Motion, the Water Board seeks dismissal of each of the six causes of action asserted in the Amended Complaint. By contrast, Foster Farms' Motion for Summary Judgment addresses only the existence of an express or implied contract between the parties, an element of Count Three. The Court will navigate these issues in the order in which the parties presented them.

### A. Declaratory Judgment Claim (Count Six).

Foster Farms' claim for declaratory judgment focuses on Resolution 2017-004, in which the Water Board lowered the permitted discharge level for oil and grease from 50 mg/l to 5 mg/l, while simultaneously doubling the surcharge on discharges exceeding that level. As pleaded in the Amended Complaint, Foster Farms alleges that (i) it is the primary (or only) customer adversely affected by those changes; (ii) it will be unable to adhere to these new limits on a consistent basis; (iii) the Water Board imposed the new rate structure with no community/industry input; (iv) the Water Board acted arbitrarily and capriciously, with the

purpose of targeting and retaliating against Foster Farms for demanding water service improvements to the plant; and (v) Resolution 2017-004 is unreasonable, outside the Water Board's authority, and motivated by improper purposes. (Doc. 28, ¶¶ 64-70.) On that basis, Foster Farms requests that this Court declare Resolution 2017-004 to be void as having been enacted arbitrarily and capriciously for ulterior purposes, or beyond the Water Board's lawful authority. (*Id.* at 20.)

Defendant moves for summary judgment on Count Six on two grounds. First, the Water Board contends that Foster Farms lacks standing to pursue this claim because it cannot show that, at the time of filing the Complaint, it suffered some actual or threatened injury resulting from the challenged conduct. The Water Board correctly articulates the injury-in-fact requirement. *See, e.g., Hollywood Mobile Estates Ltd. v. Seminole Tribe of Florida*, 641 F.3d 1259, 1265 (11th Cir. 2011) ("the 'irreducible constitutional minimum' of standing under Article III consists of three elements: an actual or imminent injury, causation, and redressability. … The party invoking federal jurisdiction bears the burden of proving standing.") (citations and internal quotation marks omitted).[13] But the record viewed in the light most favorable to Foster Farms reflects sufficient evidence of actual or imminent injury to withstand summary judgment. Plaintiff's evidence is that the 5 mg/l threshold for oil and grease discharge is a level it cannot consistently meet, and that it faced an imminent risk of injury at the time the Complaint was filed because excess discharges result in imposition of surcharges. Indeed, Foster Farms shows that it exceeded the 5 mg/l level in October 2018, for which it expected to receive an invoice to pay the surcharge. On this record, the Court finds that Foster Farms has made a sufficient showing of a concrete, particularized actual injury from Resolution 2017-004 to have Article III standing to litigate the legality of the Water Board's action.

Second, the Water Board contends that Foster Farms' declaratory judgment claim fails for lack of evidence that defendant acted arbitrarily and capriciously in enacting Resolution 2017-004. Alabama law specifically confers upon boards of water and sewer commissioners the

---

[13] "Injury in fact is a constitutional requirement. … To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, --- U.S. ----, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (citation and internal quotation marks omitted).

power and authority "[t]o fix and revise from time to time and charge and collect rates, fees, and charges for the use of or for the services and facilities furnished by any system operated by the board." Ala. Code § 11-50-343(a)(8).  Those rates, fees and charges "shall not be subject to supervision or regulation by any commission, board, bureau, department, agency, or official of the state or of the city."  Ala. Code § 11-50-351(a).  Nonetheless, both sides concur that the Water Board's rates, fees and charges may be struck down as void if they are arbitrary, discriminatory or unreasonable.  (Doc. 46, at 13-15; doc. 53, at 27-28.)  Substantial Alabama authority supports this view.[14]

Thus, the question on summary judgment is whether the record viewed in the light most favorable to Foster Forms supports a reasonable inference that Resolution 2017-004 was enacted arbitrarily, discriminatorily or unreasonably.  The Court answers this question in the affirmative. Plaintiff's evidence shows the following: (i) the Water Board proposed reducing the oil and grease discharge threshold only in response to Foster Farms' repeated complaints about inadequate water service; (ii) Foster Farms was the primary (and perhaps the only) Water Board customer adversely affected by the 90% reduction in the allowable oil and grease discharge level and the doubling of the surcharge for exceeding that limit; (iii) plaintiff's expert engineer, David Upton, opined that "the mandating of 5 mg/l is extremely and unreasonably low" because most wastewater treatment systems are designed to handle oil and grease discharges of 90 mg/l to 100 mg/l, such that the Water Board "had no reasonable, rational or scientific basis to lower the oils and grease waste-water surcharge rate to 5 mg/l" (Upton Aff. (doc. 54, Exh. 14), at 6-7); (iv) the Water Board's decision to implement a 5 mg/l surcharge rate was purportedly based on a recommendation by ADEM, with a consulting engineer telling the Water Board "that ADEM

---

[14]    *See, e.g., Marshall Durbin & Co. of Jasper, Inc. v. Jasper Utilities Bd. of City of Jasper*, 437 So.2d 1014, 1019 (Ala. 1983) ("The trial court, in reviewing the rates set by the Board, must determine whether these rates are reasonable. … The rate set for [water] services may not be arbitrary or discriminatory.") (citations and internal quotation marks omitted); *Pritchett v. Nathan Rodgers Const. and Realty Corp.*, 379 So.2d 545, 548 (Ala. 1979) ("Clearly, the city has the power to regulate for the protection of the health of its citizens, but that power can not be exercised arbitrarily."); *Spear v. Ward*, 74 So. 27, 29 (Ala. 1917) (explaining that statutes and ordinances relating to installation of sanitary sewer systems "will be indulged by the courts, with the presumptions in their favor, as to their necessity, propriety, and validity, in the absence of a showing to the effect that they are unreasonable, arbitrary, unduly oppressive, or inconsistent with the legislative policy of the state").

looked like they had been sticking to around 5 ppm" (McCants Dep., at 252, 257-58); (v) no one at ADEM recommended that Foster Farms impose a 5 mg/l limit on oil and grease discharges, and ADEM's 30(b)(6) deponent has never seen a limit that low in a pretreatment program; and (vi) plaintiff effectively acknowledges that Foster Farms' discharge levels were very low, undermining the need for such extreme reduction of the discharge limit in the first place.

If this testimony were to be accepted and credited at trial, a reasonable finder of fact could conclude that the Water Board acted in an arbitrary, unreasonable and retaliatory manner by enacting Resolution 2017-004, to punish Foster Farms for complaining and to fix an oil and grease discharge level that was both devoid of any scientific, reasonable or rational basis, and bereft of the ADEM recommendation that the Water Board invoked as its justification for imposing it. Accordingly, the Court readily finds genuine issues of material fact in the record as to the reasonableness, arbitrariness or discriminatory character of Resolution 2017-004 that are fatal to the Water Board's Motion for Summary Judgment as it relates to Count Six (declaratory judgment). The Motion is properly **denied** as to this claim.

### B.    *Injunctive Relief Claim (Count Five).*

In Count Five of the Amended Complaint, Foster Farms asserts a common-law claim for injunctive relief, predicated on allegations that Foster Farms is suffering "irreparable damage and harm to its business," as well as risks to the health and well-being of its employees, because of the Water Board's failure to supply adequate water volume and pressure. (Doc. 28, ¶¶ 59-60.) Specifically, Count Five requests issuance of an order "[p]ermanently enjoining the Water Board from failing to meet its obligations to provide adequate water services to the plant." (*Id.*, ¶ 62(a).)

The Water Board moves for summary judgment on Count Five, asserting that Foster Farms' claim for injunctive relief is moot because there are no longer any problems with the water service, volume or pressure being supplied to the Foster Farms plant. It is well settled that "[a] claim for injunctive relief may become moot if: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Reich v. Occupational Safety and Health Review Com'n*, 102 F.3d 1200, 1201 (11th Cir. 1997) (citation omitted); *see also Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) ("[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief …

if unaccompanied by any continuing, present adverse effects") (citations omitted). More generally, a claim must be dismissed as moot when "events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief." *Hall v. Secretary, Alabama*, 902 F.3d 1294, 1297 (11th Cir. 2018) (citation omitted); *see also Aaron Private Clinic Management LLC v. Berry*, 912 F.3d 1330, 1335 (11th Cir. 2019) ("A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.") (citations omitted). The party asserting mootness bears the burden of showing that there is "no reasonable expectation that the challenged practice will resume after the [claim] is dismissed." *Walker v. City of Calhoun, GA*, 901 F.3d 1245, 1270 (11th Cir. 2018) (citation omitted).

To advance its mootness argument, the Water Board relies on testimony that there have been no complaints or problems at the Foster Farms plant following reestablishment of service via the IP Tower on June 7, 2018. (McCants Aff., at 4; Ferrell Dep., at 8.) In response, Foster Farms insists that there is not only a reasonable likelihood of recurrence, but that water problems caused by the Water Board have persisted through the present. (Doc. 53, at 30.) The cited record evidence, viewed in the light most favorable to Foster Farms, does not support this proposition. First, plaintiff states that after June 2018, "[o]utages to the evaporating cooling towers have continued, resulting in several unplanned ammonia releases from the system." (*Id.*) But Richard Ferrell, Foster Farms' engineer and maintenance manager for the plant, testified to the contrary. Ferrell identified just two ammonia releases, one in May 2018 that predated the IP Tower changeover and only "one since" June 7, 2018, "but that was not due to a water issue. That was a faulty gasket that let loose." (Ferrell Dep. (doc. 55, Exh. A), at 5, 8.) Ferrell also confirmed that "[s]ince June we've had an improvement in flow coming through the plant," and indicated that as to flow and pressure, "I've not had any complaints." (*Id.* at 6, 8.) Thus, Plaintiff's own production maintenance engineer, who is responsible to "[k]eep the facility operating" (*id.* at 8), refutes Foster Farms' position that unplanned ammonia releases have occurred because of water service problems following the June 2018 changeover to the IP Tower.

Second, Foster Farms points to the risk inspection performed by its Global Risk Consultant, Ben Smith, in September 2018. (Doc. 53, at 30.) True enough, Smith found that even after the June 2018 changeover to the IP Tower, "[t]he 2018 flow test reflects that recorded

water test does not satisfy the base of riser demands for any of the sprinkler systems. …
Regarding flow in or pressure, deficient." (Smith Dep., at 98, 100.) A closer look at Smith's
testimony, however, reveals his findings that these deficiencies have nothing to do with the
Water Board. Indeed, Smith confirmed that the deficient 2018 readings he was reporting were
taken at the private meter owned by Foster Farms, not the public meter. (*Id.* at 32-33.) By
contrast, the most recent readings he had taken at the public meter (in 2017) showed sufficient
flow and pressure that "had the ability of meeting a number of the sprinkler system base of riser
demands." (*Id.* at 34-35.)[15] Indeed, Smith acknowledged that the "hydrant right under the water
tower near the plant" had readings that "will satisfy … the hydraulic design criteria that's
currently established for the sprinkler systems at the facility." (*Id.* at 36-37.) Smith testified that
he did not know where or why pressure and flow were being lost somewhere between the Water
Board's public hydrant and the Foster Farms private hydrant located just 75 feet away. (*Id.* at
38-39, 100-02.)

 Unpacking this testimony and viewing it in the light most favorable to Foster Farms,
plaintiff's risk consultant did not identify <u>any</u> problems with the Water Board's water service to
the Foster Farms plant in September 2018. Although he did find that flows and pressure were
insufficient to operate the plant's fire sprinkler system, Smith also indicated that those
inadequate readings were found only at the Foster Farms hydrant, not at the nearby Water Board
hydrant where flows and pressures had been sufficient. Simply put, then, plaintiff's own witness
testified to post-June 2018 problems not with the Water Board's service to the plant, but with
Foster Farms' internal water system. Those issues were squarely identified to be on Foster
Farms' side of the meter, not the Water Board's. Thus, Smith's testimony lends no support to
plaintiff's contention that Water Board-caused service problems persist today.

 On summary judgment, Foster Farms identifies no other record evidence that water
service problems were either ongoing through the present or that they were reasonably expected
to reoccur in the wake of the June 2018 tie-in to the IP Tower. Viewed in the light most
favorable to plaintiff, then, the cited record evidence shows that (i) Foster Farms' engineer and

---

[15] The public hydrant readings date back to 2017; however, Smith opined that "I
don't have 2018 flow test, but I would expect for it to be the same" for that location. (*Id.* at 101.)
Thus, plaintiff's risk consultant's opinion is that water service to the public hydrant adjacent to
the Foster Farms hydrant is adequate to meet the plant's needs for pressure and flow.

maintenance manager testified that he had no complaints with water flows and pressures after June 2018; (ii) no post-June 2018 ammonia releases caused by defective water service have occurred; (iii) water pressure and flow to the Water Board hydrant in close proximity to the Foster Farms hydrant are adequate for fire sprinkler system operations; and (iv) the water pressure and flow issues relating to fire suppression exist on the Foster Farms side of the meter and are of unknown causes.

On this evidence, the Court concludes that no genuine issues of material fact exist, and that there is no longer a live controversy as to the present water service with respect to which a permanent injunction could afford any meaningful relief to Foster Farms. An injunction to require the Water Board to provide adequate water service to Foster Farms would be meaningless and ineffectual, because all evidence before the Court is that (i) the Water Board has in fact provided adequate water service to Foster Farms since June 2018 and (ii) there is no reasonable expectation of reoccurring service disruptions. Count Five is moot, and defendant is entitled to summary judgment on that cause of action for injunctive relief.

### C.      *Negligence Claim (Count One).*

Count One of the Amended Complaint is framed as a negligence claim. Plaintiff's stated theory of relief is that "[t]he Water Board negligently breached its duties to Foster Farms by failing to provide adequate water service, … and by failing to reasonably design, construct, monitor and maintain the new system that was to provide such water services to Foster Farm's [*sic*] plant." (Doc. 28, ¶ 33.) The Water Board moves for summary judgment on Count One on multiple grounds.

#### 1.      *Statute of Limitations and Equitable Estoppel.*

First, defendant objects to Count One on timeliness grounds. Under Alabama law, negligence claims are governed by a two-year limitations period. *See, e.g., Piazza v. Ebsco Industries, Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001) ("Under Alabama law, claims for negligence are subject to a two-year statute of limitations."); Ala. Code § 6-2-38(*l*) ("All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."). The Water Board reasons that

because Foster Farms filed its Complaint on October 31, 2017, all aspects of its negligence claim predating October 31, 2015 are time-barred.[16]

In response, Foster Farms maintains that the Water Board should be equitably estopped from asserting the two-year limitations bar because of its repeated representations that it would remediate the water service issues at Foster Farms. Alabama courts have declined on estoppel grounds to enforce a limitations bar where a defendant has represented to a plaintiff that it would correct a problem, and the plaintiff delayed filing suit in reliance on such representations. *See, e.g., Mason v. Mobile County*, 410 So.2d 19, 21 (Ala. 1982) ("The County of Mobile represented to the Masons on several occasions that it would attempt to correct the problem with the drainage pipe. Relying on these representations, Mr. Mason delayed bringing an action. It would be inequitable to permit the County of Mobile to assert the statute of limitations as a bar to bringing the cause of action.").[17] For equitable estoppel to apply in this context, the defendant must have engaged in conduct that "amount[s] to an affirmative inducement to the claimant to delay bringing action," and such a defense must be evaluated by reference to "whether a reasonable person would have allowed the statute of limitations to expire based on the defendants' actions." *Pate v. Toto*, 2018 WL 4951975, *12 (N.D. Ala. Oct. 12, 2018) (citations omitted).

---

[16]     The Water Board also contends that Count One is barred because the disruption to Foster Farms' water service was caused by "permanent and unabatable conditions." (Doc. 46, at 17.) Defendant is correct that in cases of injury by a permanent and unabatable condition, "one may not recover in successive suits, but his damages are awarded in solido in one action." *Reichert v. City of Mobile*, 776 So.2d 761, 764-65 (Ala. 2000) (citation omitted). But there is nothing "permanent and unabatable" about the water service issues described in the Amended Complaint; to the contrary, the Water Board's evidence establishes that the conditions causing disruption to Foster Farms' water service were transitory and abatable, and that the Water Board's remedial actions in fact cured and eliminated those adverse conditions. Thus, the *Reichert* reasoning has no application here.

[17]     *See also Sirmon v. Wyndham Vacation Resorts, Inc.*, 922 F. Supp.2d 1261, 1278 (N.D. Ala. 2013) (where defendant repeatedly promised a "complete collaborative response" to plaintiff's concerns, "the Court finds that injustice would result from refusing to allow a jury to consider whether Defendants should be estopped from asserting the statute of limitations as a defense. Accordingly, Plaintiffs are entitled to have a jury consider their estoppel claim when determining whether the statute of limitations expired prior to the instigation of this lawsuit."); *Easterling v. Kolbe & Kolbe Millwork Co.*, 2012 WL 4378111, *3 (M.D. Ala. Sept. 25, 2012) (describing rule in *Mason* as allowing estoppel where "the defendant had prevented the plaintiff from filing suit with promises the damage would be repaired at some later date").

The summary judgment record includes evidence of affirmative inducements by the Water Board to delay legal action by Foster Farms, such that a finder of fact could reasonably conclude that a reasonable person would have allowed the limitations period to expire based on the Water Board's actions. Most notably, in June 2016, when Foster Farms pressed the Water Board to take corrective measures and threatened litigation if it did not, the Water Board executed a written Statement of Intent, through which it committed to completing repairs to Foster Farms' water service by September 15, 2016. As early as November 2014, the Water Board assured Foster Farms that eliminating water disruptions at plaintiff's facility would be addressed as a "top priority." Plaintiff's evidence also shows that Foster Farms forwent taking legal action against the Water Board in reliance on the Water Board's assurances of corrective action and repairs to improve plaintiff's water service. Given these record facts, the interests of equity require that a finder of fact consider Foster Farms' estoppel claim in determining whether the statute of limitations expired prior to the initiation of suit.[18]

### 2. Avoidable Consequences.

Second, defendant seeks summary judgment on the negligence cause of action on an "avoidable consequences" theory. In particular, the Water Board insists that "any damages allegedly incurred after November 2016 are barred by the avoidable consequences doctrine"

---

[18] Three additional observations are pertinent. First, the Water Board suggests that estoppel is inapplicable because Foster Farms waited until well after the deadline fixed by the Statement of Intent to initiate suit. (Doc. 55, at 7.) But plaintiff's evidence is that defendant provided numerous other assurances – including long after the Statement of Intent deadline – on which plaintiff relied in refraining from legal action. Second, although the Water Board touts a paucity of evidence of fraudulent concealment or of a promise to "make the system foolproof," that is not the legal standard. (*Id.* at 8.) To be sure, the *Mason* rule is limited by the requirement that a plaintiff's reliance on assurances be <u>reasonable</u>. Under all circumstances here, a reasonable finder of fact could conclude that Foster Farms' decision to forbear filing legal action in reliance on the Water Board's reassurances of corrective action was reasonable. Third, defendant's contention that Foster Farms' negligence claim pertaining to parking lot damage is time-barred because "there was no assurance regarding the parking lot" (*Id.* at 9) overlooks record evidence to the contrary. Foster Farms' plant manager avers that after "dig[ging] out large portions of Foster Farm's [*sic*] concrete lot[,] [t]he Board made repeated assurances to us these damages would be repaired but to date has not lived up to those commitments." (Miller Aff., ¶ 3.) Plaintiff's estoppel argument as it relates to timeliness of the negligence claim for parking lot damage is thus supported by genuine issues of material fact that preclude summary judgment.

because "[t]hose damages were proximately caused by Plaintiff's deliberate decision to stay on the temporary line," rather than returning to the repaired IP Tower service line. (Doc. 46, at 19.)

The Water Board is correct that, as a matter of Alabama law, Foster Farms was obligated to exercise ordinary care to reduce its damages. *See, e.g., Britton v. Doehring*, 242 So.2d 666, 671 (Ala. 1970) ("the doctrine of mitigation of damages, frequently called avoidable consequences, applies … to a plaintiff's conduct [s]ubsequent to the wrongful act of the defendant").[19] But the Water Board's contention that Foster Farms failed to mitigate its damages via its "deliberate decision" to remain on the Tosco Tower service line after November 2016 is a disputed question of fact. Indeed, Foster Farms' evidence is that it initially went back on the IP Tower line in fall 2016, but that "[a]lmost immediately upon being placed back onto this system, the plant began to experience disruptions due to low pressure and inadequate flow to the boilers and refrigeration evaporative cooling towers." (Miller Aff., ¶ 8.) Plaintiff's evidence further shows that after multiple failures and operational shutdowns on the IP Tower line, Foster Farms was "compelled to request that the Board put the plant back on the Tosco tower so as to mitigate even higher levels of disruption" being experienced on the IP Tower line. (*Id.*) Thus, significant issues of material fact remain as to whether Foster Farms adequately mitigated its damages when it chose to go back on the Tosco line, and defendant is not entitled to summary judgment on Count One on an avoidable consequences theory.

### 3. *Breach of Duty.*

Third, the Water Board moves for summary judgment on the negligence claim on the ground that Foster Farms has failed to show a breach of duty. Alabama authority supports the proposition that a municipal corporation can be held liable in tort only for breach of an underlying duty. *See, e.g., Hilliard v. City of Huntsville*, 585 So.2d 889, 890 (Ala. 1991) ("we recognize that before liability for negligence can be imposed upon a governmental entity, there must first be a breach of a legal duty owed by that entity"). It is beyond serious dispute that the

---

[19]     *See also Avco Financial Services, Inc. v. Ramsey*, 631 So.2d 940, 942 (Ala. 1994) ("the injured or damaged party is legally bound to lessen the recoverable damages so far as is practicable by the use of ordinary care and diligence. Thus, the rule of mitigation requires a party suffering injury, damage, or loss to take reasonable steps to reduce it."); *Carnival Cruise Lines, Inc. v. Goodin*, 535 So.2d 98, 103 (Ala. 1988) ("Generally, an injured party is required to mitigate his damages in a reasonable manner consistent with what an ordinarily prudent person would do in similar circumstances.").

Water Board owed a duty of care to Foster Farms to properly maintain and operate the water system. *See Harris v. Board of Water and Sewer Com'rs of City of Mobile*, 320 So.2d 624, 629 (Ala. 1975) ("given the fact that the hydrant was installed, the failure to use reasonable care in its maintenance … is a sufficient breach of duty to provide a party with a cause of action under the theory of simple negligence"); *City of Mobile, Ala. v. Sullivan*, 667 So.2d 122, 126-27 (Ala.Civ.App. 1995) ("There is a long line of cases holding counties and municipalities generally liable for failing to properly maintain or operate their sewer and drainage systems, streets, public ways, or buildings."); *Code of Ordinances, City of Demopolis Alabama*, § 13-1 (conferring upon Water Board the right, privilege, authority and franchise to maintain, construct and operate water distribution system for the purpose of supplying water to the City and its inhabitants). Defendant has neither argued nor presented authority to the contrary.[20]

On summary judgment, the Water Board posits that there is no evidence of breach of such a duty. Defendant maintains that the record is devoid of proof that it "had actual notice of the problem and failed to respond." *Locke v. City of Mobile*, 851 So.2d 446, 453 (Ala. 2002) (awarding summary judgment to municipality on claim for negligent maintenance of drainage system where plaintiff "failed to present substantial evidence indicating that the maintenance problems existed for such a length of time that constructive notice of the drainage buildup could be imputed to the City and/or that the City had actual notice of the problem and failed to respond"). The "actual notice" argument is untenable. After all, the record is awash with evidence that the Water Board was aware of significant, ongoing water service issues affecting Foster Farms for a period of years. For example, a Water Board representative acknowledged that as of 2014 the service issues with the IP Tower line (including numerous breaks and service interruptions to Foster Farms) were a "known" problem that the Water Board was responsible for fixing. (McCants Dep., at 109-10.)

---

[20] At most, the Water Board protests that no utility service "has a duty to provide 'perfect' service without exception, or … can be held liable for 'less than perfect' water service." (Doc. 46, at 20.) But this is a straw man. Foster Farms has never couched any duty owed by the Water Board in those terms; rather, Foster Farms frames defendant's duty as one to provide reliable water service (both pressure and volume), and to design, construct and maintain a water supply system in a reasonable manner. Defendant does not quarrel with, much less advance any cogent argument in opposition to, those propositions.

Thus, the Water Board's "no breach of duty" argument for Count One ultimately turns on the adequacy of its response to a water service issue as to which it had actual notice dating back to 2014. Record evidence on this point could reasonably support multiple conflicting inferences. But plaintiff's evidence shows that from March 2014 through June 2018, the Water Board, despite actual knowledge of the problem, failed to provide adequate water service to the Foster Farms plant, which was plagued by numerous service interruptions and outages. (Miller Aff., ¶¶ 3-9.) Defendant protests that this evidence is not sufficient to allow plaintiff's negligence claim to reach a jury, because "[t]here is no expert testimony that the Water Board 'took too long' to repair the water line, and after November 2016, it was the plaintiff's decision to remain on the Myrtlewood system." (Doc. 55, at 9.) But the Water Board points to no Alabama authority requiring expert testimony to show that delayed corrective action amounts to a breach of a duty by a public utility. Moreover, the record in the light most favorable to Foster Farms shows that plaintiff's decision to remain on the Tosco Tower line after November 2016 was driven not by irrational self-sabotage, but rather by systemic failures experienced when Foster Farms first tied back into the ostensibly repaired IP Tower line (*i.e.*, those repairs failed to remediate plaintiff's water service issues). Accordingly, merely arguing that Foster Farms has failed to present expert testimony about the length of the delays and that Foster Farms chose to remain on the Tosco Tower line even after the IP Tower line was repaired cannot carry the day for defendant on summary judgment.

Alabama courts caution that negligence issues are rarely appropriate for summary judgment, and that breach of duty determinations are generally for the finder of fact to resolve at trial. *See, e.g., Hilburn v. Shirley*, 437 So.2d 1252, 1254 (Ala. 1983) ("because of the nature of negligence actions, almost always issues of fact are involved so that summary judgment is rarely appropriate in such cases"); *Turner v. Dee Johnson Properties*, 201 So.3d 1197, 1200 (Ala.Civ.App. 2016) ("A summary judgment is rarely appropriate in a negligence case.") (citations omitted). This case underscores the difficulties inherent in moving for summary judgment on a negligence claim. Drawing reasonable inferences in the light most favorable to Foster Farms from record evidence, a reasonable finder of fact could conclude that the plant was without reliable water service (volume and pressure) for more than four years and that the Water Board's responses to plaintiff's persistent complaints and requests for relief were inadequate for

a protracted period of time.  Summary judgment is not appropriate on defendant's "no breach of duty" theory.

### 4.    *Substantive Immunity.*

Finally, the Water Board invokes the doctrine of substantive immunity as a ground for seeking summary judgment on Count One.  "Substantive immunity shields a municipality from liability for the negligent acts of its employees in those narrow areas of governmental activities essential to the well-being of the governed, where the imposition of liability can be reasonably calculated to materially thwart [a municipality's] legitimate efforts to provide such public services."  *Ex parte Utilities Board of City of Foley*, --- So.3d ----, 2018 WL 3153581, *9 (Ala. June 28, 2018) (citation and internal quotation marks omitted).  "The substantive-immunity rule is given effect in the context of those public service activities of governmental entities … so laden with the public interest as to outweigh the incidental duty to individual citizens."  *Id.* (citation and internal quotation marks omitted).  The reasoning behind this rule is that "a breach of a duty owed to the general public will not form the basis for a negligence claim by an individual citizen."  *Id.* (citation omitted).

In applying such principles, the obvious question is whether the Water Board's efforts to restore water service to the Foster Farms plant are properly viewed as lying within the narrow area of public service activities of a governmental entity so laden with the public interest as to outweigh an incidental duty to individual citizens.  Defendant's summary judgment filings fail to identify any analogous circumstances in which Alabama appellate courts have held that substantive immunity applies to the maintenance and operations of a public utility system.[21] Contrary to the Water Board's position, the Alabama Supreme Court has repeatedly found that substantive immunity does <u>not</u> shield a municipality from liability for negligence in the design or maintenance of public utility systems.  *See, e.g., Long v. Jefferson County*, 623 So.2d 1130, 1136 (Ala. 1993) (no substantive immunity for county that constructed sewer system in such a manner that it could not withstand weight of a house, because a government entity "is under a duty to

---

[21]    To be sure, the Water Board cites two cases in which the Alabama Supreme Court found that municipalities were shielded by substantive immunity for liability for negligent plumbing or electrical inspections, because those inspection activities were designed to protect the public, not individual citizens.  (Doc. 46, at 21-22.)  This is not a negligent inspection case, and the rationale of the cited decisions lacks any discernible application here.

exercise due care when it constructs and operates a sewage or drainage system, and it may be liable for damages proximately caused by its negligence"); *Sullivan*, 667 So.2d at 126-27 (notwithstanding substantive immunity rule, which "has been narrowly applied, … [t]here is a long line of cases holding counties and municipalities generally liable for failing to properly maintain or operate their sewer and drainage systems, streets, public ways, or buildings").

Simply put, the Water Board has pointed to no authorities (and the Court has found none) in which Alabama courts have extended the narrow doctrine of substantive immunity to insulate municipal corporations from liability for the design, maintenance, operation or repair of public utility service lines. To the contrary, Alabama courts have resisted expansion of substantive immunity to reach such circumstances. The Court declines defendant's invitation to enlarge the scope of the substantive immunity rule in this manner. Defendant's Motion for Summary Judgment is **denied** as to Count One.

### D.     *Breach of Contract Claims (Counts Three and Four).*

Counts Three and Four of the Amended Complaint are framed as claims for breach of contract. Specifically, Count Three alleges "Foster Farms and the Water Board have an express or implied contract whereby in consideration for payment of monthly fees for adequate water service by Foster Farms, the Water Board has agreed to provide adequate water services," but that the Water Board breached this contract by failing to provide adequate water service to the plant. (Doc. 28, ¶¶ 47-50.) Similarly, Count Four pursues recovery for breach of contract on a third-party beneficiary theory, alleging that the Water Board breached an express or implied contract with the City of Demopolis to meet the water supply needs of its citizens, and that Foster Farms is an intended third-party beneficiary of such contract. (*Id.*, ¶¶ 53-56.)

As to Count Three, the parties pursue cross-motions for summary judgment as to the existence *vel non* of an express or implied contract between the Water Board and Foster Farms. Relevant record facts include the Water Board's 30(b)(6) testimony acknowledging that (i) Foster Farms is a customer of the Water Board, (ii) the Water Board delivers water services to Foster Farms, (iii) Foster Farms pays money to the Water Board in exchange for those services, and (iv) Foster Farms has a right to expect to receive the same water services (in terms of pressure and flow) over time as long as it pays its bills to the Water Board. (McCants Dep., at 87.) The current Water Board chairman likewise testified that the Water Board provides water to

its customers, in exchange for which the Water Board receives money from them to pay for that product.  (Reynolds Dep., at 32.)

More than a century ago, the Alabama Supreme Court explored the contractual status of water companies and private citizens in a case called *Spencer v. Bessemer Waterworks Co.*, 39 So. 91 (Ala. 1905).  The *Spencer* Court quoted with approval a treatise stating as follows: "When a private citizen pays for water to be furnished by the supply company, he enters into direct contract with the company, and is entitled to receive the supply; and in case it is not furnished or the quality is so bad as to cause injury to him, he has a right of action for the breach of the contract."  *Id.* at 92 (citation omitted).  However, *Spencer* did not have occasion to apply this principle because the complaint in that case failed adequately to plead the existence and terms of a contract.  More than 60 years later, the Alabama Supreme Court opined that an implied contractual obligation to provide sewage removal exists where the record shows that (i) the water board is responsible for selling water and collecting sewage, (ii) the customer must purchase water at the going rate as a privilege of tapping into the sewer line, and (iii) by reason of the water charge, the board handles the customer's sewage.  *Water Works and Sanitary Sewer Bd. of City of Montgomery v. Norman*, 208 So.2d 788, 792 (Ala. 1968) ("This state of facts affords ample room for the finding that when appellee bought and paid for water, and by reason of this, was allowed to connect to the sewer line, there was an implied contractual obligation to remove the sewage."); *see also Alabama Water Co. v. Wilson*, 107 So. 821, 823 (Ala. 1926) (facts "afforded ample room for the finding of an implied contract binding upon the parties" where regulations required a written application for water service, which embodied a contract when accepted, and defendant, without formal application, had been furnishing water for plaintiff's refrigerating apparatus with full knowledge of the necessity of continuous supply).  Numerous other jurisdictions have likewise recognized the existence of an implied contractual relationship between a water board and its customers.[22]

---

[22]     *See, e.g., White v. Tennessee-American Water Co.*, 603 S.W.2d 140, 142 (Tenn. 1980) ("One cannot become a 'customer' of a utility without a contractual relationship. … A utility, of course, is entitled to charge reasonable rates for its services, and the pleadings in this case state on their face that the plaintiff was paying the company for such services. There could be no plainer or clearer statement of 'privity' of contract between these parties."); *Brooks v. Village of Wilmette*, 391 N.E.2d 133, 136 (Ill.App. 1979) ("The legal relationship between the municipality engaged in the business of furnishing water to its inhabitants and a water consumer (Continued)

Defendant has no effective rejoinder.  It does not cite cases (binding or otherwise) rejecting the notion of an implied contract between a public utility and its customers for the service of water.  In light of the foregoing unrebutted authorities and record evidence unambiguously showing the relationship between the Water Board and Foster Farms, the Court concludes as a matter of law that an implied contract existed between the parties in this case relating to the supply of water service.  Accordingly, defendant's Motion for Summary Judgment is **denied** as to the existence of a contract, and plaintiff's Motion for Partial Summary Judgment is **granted** as to the existence of such a contract and the Water Board's concomitant duty to provide adequate and reasonable water service to Foster Farms.  As to whether the Water Board breached the contractual duty to provide such service, genuine issues of material fact preclude entry of summary judgment for defendant.  Plaintiff has not moved for summary judgment on the question of breach.

With respect to the third-party beneficiary claim presented in Count Four, the Water Board moves for summary judgment based on its conclusory statement that "Plaintiff has not presented any evidence of … a contract between the Water Board and the City of Demopolis." (Doc. 46, at 22.)  Sure it has.  Foster Farms' evidence includes the Certificate of Incorporation of the Water Works Board of the City of Demopolis dated November 3, 1948, reflecting that the City formed the Water Board for the purposes of acquiring, constructing, operating, maintaining, improving and extending the City's water system.  (Doc. 54, Exhs. 27 & 27A.)  Foster Farms

---

is essentially one of contract. … The consumer's obligation to pay for the services and for use of the water furnished by a municipality and the obligation of the municipality to render adequate and reasonable water service rest upon the contract made between the user and the municipality."); *Carter v. Willis*, 117 S.E.2d 594, 597 (W.Va. 1960) (recognizing that duty to supply water "arises out of a contract between plaintiff and defendant wherein the defendant agreed to supply the plaintiff with an adequate amount of water in return for a monetary consideration"); *McGurren v. City of Fargo*, 66 N.W.2d 207, 212 (N.D. 1954) (finding allegations of complaint sufficient to constitute a cause of action where plaintiff alleged implied contract between municipality and citizen to furnish pure water, which municipality breached by mixing fluorides with water); *Nerren v. Kentucky Water Service Co.*, 230 S.W.2d 615, 616 (Ky. 1950) ("the right of a citizen to maintain an action against a water company for breach of contract has been recognized"); *Woodward v. Livermore Falls Water Dist.*, 100 A. 317, 320 (Me. 1917) ("a contract is also implied where the company furnishes water and the customer uses it and pays for it, without written agreement, the one party being bound in such case to continue the service and the other to pay for it at the established rates") (citation omitted).

cites Alabama authority for the proposition that such a charter constitutes a contract between the governing body and the corporation. (Doc. 53, at 25.) Further, Foster Farms relies on caselaw in which the Alabama Supreme Court has recognized a citizen's third-party beneficiary rights to a charter between a municipality and its water board. *See Harris v. Board of Water and Sewer Com'rs of City of Mobile*, 320 So.2d 624, 630 (Ala. 1975) (finding that facts "fall squarely within" third-party beneficiary rule where Water Board was contractually obligated to municipality to maintain adequate water supply for proper functioning of fire hydrants). Defendant provides no meaningful response to these record facts and authorities;[23] therefore, on this showing, the Court finds that defendant's Motion for Summary Judgment is properly **denied** as to the third-party beneficiary claim (Count Four).

### E. *Wantonness Claim (Count Two).*

In Count Two of the Amended Complaint, Foster Farms asserts a wantonness claim. As grounds for this claim, the pleading alleges that the Water Board wantonly breached duties owed to Foster Farms by failing to provide adequate water service, despite notice and actual knowledge of the water supply issues to the Foster Farms facility and the accompanying harm to plaintiff. (Doc. 28, ¶¶ 36-45.)

Defendant moves for summary judgment on Count Two, arguing that as a matter of Alabama law, the Water Board cannot be held liable for wanton conduct. Substantial authority supports this position. Alabama law is clear that a water works board is an agency of the municipality it serves. *See, e.g., City of Montgomery v. Water Works and Sanitary Sewer Bd. of City of Montgomery*, 660 So.2d 588, 594 (Ala. 1995) ("Although the Water and Sewer Board is a corporation, it is so organized to perform its functions as an agency of the City. Accordingly,

---

[23]     To counter Foster Farms' reliance on the charter between the City and the Water Board, defendant merely reiterates its conclusory statement that "Plaintiff has not shown … a 'contract' between the City of Demopolis and the Water Board" (doc. 55, at 10), without addressing plaintiff's evidence. As to *Harris*, defendant simply says that case can be distinguished because it "involved the loss of real property" and a water board's undertaking to provide fire protection service; however, defendant does not explain how these purported distinctions negate application here of the third-party beneficiary principles discussed in *Harris*. The Court cannot develop a summary judgment movant's arguments for it.

such a board is treated in the same light as the City itself.").[24]  Under black-letter Alabama law, municipalities cannot be held liable in tort on a wantonness theory.  *See, e.g., Ex parte Labbe*, 156 So.3d 368, 374 (Ala. 2014) ("the City cannot be held liable for wanton or intentional conduct"); *Raby v. Reese*, 2016 WL 1642677, *9 (S.D. Ala. Apr. 25, 2016) ("as a matter of Alabama law, a city is liable for negligent acts of its employees within the scope of their employment, but not intentional torts or wanton misconduct of its employees") (citation and internal marks omitted).

Thus, the Water Board reasons that because it is an agency of an Alabama municipality, and because Alabama law does not recognize tort liability for municipalities on theories of wanton or intentional conduct, Foster Farms' Count Two must fail as a matter of law.  This statement of Alabama law appears accurate, and is undisputed by Foster Farms on summary judgment.  Rather, Foster Farms acknowledges that "it chooses not to contest the wantonness defense." (Doc. 53, at 12 n.13.)  For these reasons, defendant's Motion for Summary Judgment is **granted** as to the wantonness claim.

### F.    Damage Caps.

Finally, the Water Board seeks a ruling on summary judgment that any damages awarded on plaintiff's tort claims against it are subject to a $100,000 statutory cap.  In support of this contention, Foster Farms relies on an Alabama statute providing, in relevant part, as follows: "Recovery of damages under any judgment against a governmental entity shall be limited to $100,000.00 for damage or loss of property arising out of any single occurrence."  Ala. Code § 11-93-2.

It appears undisputed that the Water Board qualifies as a "governmental entity" for purposes of § 11-93-2.  *See Williams v. Board of Water and Sewer Com'rs of City of Prichard*, 763 So.2d 938, 941 n.3 (Ala. 1999) ("§ 11-93-2 governs the extent of the Board's liability …") (citation omitted).  Nonetheless, Foster Farms argues that § 11-93-2 is inapplicable because its

---

[24]    *See also Water Works and Sewer Bd. of City of Talladega v. Consolidated Pub., Inc.*, 892 So.2d 859, 863 (Ala. 2004) ("The Water Board performs a municipal function, namely, supplying water and sewer services to the residents of Talladega.  Because public corporations perform municipal functions, they have long been held to be agencies of the municipality they serve, regardless of their organizational structure."); *City of Wetumpka v. Central Elmore Water Authority*, 703 So.2d 907, 914 (Ala. 1997) (collecting authorities holding "that a municipal water works board performs as an agent for the city").

tort claims do not seek recovery for damage or loss of property, or bodily injury, but instead are claims for an award of lost profits and other economic losses arising from the water service disruptions to Foster Farms' operations and the costs plaintiff incurred in attempting to minimize the adverse effects of those disruptions. The Amended Complaint supports this characterization of plaintiff's tort claims.[25] As such, the statutory cap is inapplicable, and the Water Board's motion to impose a limit of $100,000 on Foster Farms' damages recovery in this action pursuant to Ala. Code § 11-93-2 is **denied**.

## V.    Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.    Defendant's Motion for Summary Judgment (doc. 45) is **granted in part**, and **denied in part**. The Motion is **granted** as to Count Two (wantonness) and Count Five (injunctive relief), and those claims are **dismissed with prejudice**. In all other respects, Defendant's Motion for Summary Judgment is **denied**;

2.    Plaintiff's Motion for Partial Summary Judgment (doc. 47) is **granted**. The Court finds that, as a matter of Alabama law, an implied contract existed between Foster Farms and the Water Board at all material times. All other legal and factual issues relating to the contract claims set forth in Counts Three and Four will be resolved at trial; and

3.    This action remains set for Final Pretrial Conference on **April 9, 2019 at 9:00 a.m.**, with jury selection to follow on **April 30, 2019**.

DONE and ORDERED this 25th day of February, 2019.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[25]    Indeed, the Amended Complaint itemizes Foster Farms' damages as including the following: (i) $76,408 for installation of pressure relief valve and other mitigation costs; (ii) $394,169 for business interruption losses; and (3) $25,000 for damage to parking lot. (Doc. 28, ¶ 26.) Of these items, only the parking lot damages would constitute a claim "for damage or loss of property arising out of any single occurrence" that would be subject to the $100,000 liability cap. Plaintiff's claimed damages for parking lot repairs are far below the $100,000 limit.